**Thomas J. TACKET,**
**Plaintiff–Appellant,**

**v.**

**GENERAL MOTORS CORPORATION,**
**Defendant–Appellee.**

**No. 87–1578.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1987.

Decided Dec. 7, 1987.

J. Lee McNeely, McNeely, Sanders & Stephenson, Shelbyville, Ind., for plaintiff-appellant.

Herbert C. Snyder, Jr., Barnes & Thornburg, Ft. Wayne, Ind., for defendant-appellee.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Someone painted this sign on an inside wall of Plant 17 of the Delco Remy Division of General Motors Corp. in Anderson, Indiana:

TACKET TACKET

WHAT A RACKET

Delco painted over the sign seven to eight months later. Thomas J. Tacket, the night superintendent of Plant 17 at the time the sign appeared, filed this action for defamation in an Indiana court. General Motors removed it to federal court under the diversity jurisdiction. At the close of the trial, General Motors asked for, and the district judge granted, a directed verdict under Fed.R.Civ.P. 50(a). The judge reasoned that Tacket could have ordered the sign painted over earlier and had only himself to blame for any injury he suffered by delay.

The spray-painter juxtaposed Tacket with "racket" for more than the rhyme. Tacket drew attention by his role in securing GM's approval for a purchase order covering 2,000 wooden boxes to be built by "S & T Specialties", a firm located in the garage of Edward Spearman, a subordinate and friend of Tacket's. Delco had a contract to build some generators and needed crates in which to ship them. Spearman modestly suggested S & T as their manufacturer without mentioning his interest in S & T. Spearman and Tacket signed the requisition. During off-duty hours Tacket carried it to other plants to secure the remaining necessary signatures. This was not part of Tacket's job as night superintendent of Plant 17, and he concedes that he lacked the authority to sign a requisition as authorizing supervisor in the originating department and that he had never before done so. He testified that he had been told that Delco needed boxes pronto, that he was simply helping the firm to fulfill an important commitment, and that he had no idea Spearman was the "S" of "S & T Specialties".

The union representing Delco's workers discovered that the firm was buying the boxes and protested the subcontracting of work that Delco's own staff could have done. The union also discovered that Spearman was the "S", and suspected that Tacket was the "T", of "S & T Specialties". Delco promptly suspended both Spearman and Tacket pending an investigation, for managers' standing on both sides of such an arrangement violated GM's rules in addition to being bad labor relations. GM ultimately fired Spearman but concluded that it had insufficient evidence of Tacket's

role in "S & T Specialties" to warrant his discharge. Tacket returned to work on April 9, 1985, still nominally night superintendent of Plant 17. His relations with the workers had soured, however, and on April 16, 1985, Delco transferred him to a "quality assurance team" with the same rank and salary but a much smaller group of subordinates.[1]

The workers started spreading rumors about Spearman and Tacket as soon as they learned about the subcontracting. After suspending the duo, higher managers explained to their subordinates what they had done and why. The manager of the Anderson plant explained to his immediate subordinates; the managers at this meeting explained to their subordinates; the chain extended through several levels of management and reached the rank-and-file. Meanwhile a sign approximately 3′ × 30′ appeared inside Plant 17 proclaiming "TACKET TACKET WHAT A RACKET". This sign stayed up for two or three days. The smaller stenciled sign replaced it, shortly before Tacket returned to work. Tacket contends that the meetings and signs are libelous and lowered him in the esteem of his subordinates, peers, and the community at large.

■ The district court granted a directed verdict to GM on the claims arising out of the meetings because it concluded that the statements relayed through the chain of command were true and, if not, then privileged. A federal court in a diversity case applies the same standard as a state court in passing on a motion for directed verdict. *Chaulk v. Volkswagen of America, Inc.*, 808 F.2d 639, 640 (7th Cir.1986). The courts of Indiana inquire whether the evidence, taken with reasonable inferences in the light most favorable to the party opposing the motion, support a judgment in the non-movant's favor. *American Optical Co. v. Weidenhamer*, 457 N.E.2d 181, 183–84 (Ind.1983). A scintilla of evidence is not enough; the court may search for both quantitative and qualitative adequacy.

■ Even with the benefit of all reasonable inferences, Tacket did not establish that Delco, by its managerial personnel, published falsehoods about him. Witnesses testified that speakers at the meetings said that Delco had suspended Tacket pending an investigation into his role in the purchase order and in "S & T Specialties". These meetings necessarily related managers' suspicions about Tacket's honesty and their desire to find out how deeply he was involved, but a disclosure that he had been suspended on suspicion of misconduct was accurate. Tacket concedes that Delco had cause to suspect and suspend him.

Tacket relies on the testimony of several witnesses that they understood from these meetings that Tacket was a thief. One witness said that the speaker at one meeting reported that Tacket had been suspended pending investigation of "his involvement with the misappropriation of the 813." (An "813" is a Delco purchase order, a form known by its number.) John Maier said that Dick Flowers, a supervisor of Plant 17, accused Tacket of thieving material:

Q. Did they indicate why he was under suspension?

A. It was due to an 813 and some type of misappropriation of materials, as I understood it. It was a short meeting.

Q. What type of misappropriation of material?

A. I didn't know at the time. There was never an explanation at that time. Later we understood it to be some plywood to make some creates [sic] of some kind.

Q. Did you understand what they meant by a misappropriation of the plywood, or whatever?

A. It inferred theft, as we could understand it. You know, how, I don't know.

—which would imply that GM sees "quality assurance" as the sort of dead-end task that can be given to people whose usefulness with the firm has reached an end.

---

1. Lateral transfers are a traditional way of dealing with people who no longer can do their jobs. We trust that this transfer was not the "lateral arabesque" described by Lawrence J. Peter & Raymond Hull, *The Peter Principle* 38–39 (1969)

The district court discounted this and similar testimony on the ground that the witnesses were relating what they *understood* rather than what was *said*. Some misunderstanding was apparent, because no one accused Tacket of stealing a purchase order form (to which he had legitimate access) or stealing plywood. Some misunderstanding, perhaps a confabulation of what was said at the meetings and rumors circulating at the plant, was inevitable. The word had been spread that Tacket rammed through a purchase order that diverted money to "S & T Specialties"; the meeting describing Tacket's suspension was bound to "confirm" the worst in the minds of some, no matter how careful the speakers were to distinguish suspicion from accusation.

General Motors is not liable for the misunderstandings that some people are bound to entertain about a suspension, even after it has been explained to them. The defense of truth, recognized in Indiana, *Elliot v. Roach*, 409 N.E.2d 661, 681 (Ind.App.1980), would be worth very little if misunderstandings of true statements—misunderstandings generated by rumors that the speaker may have been trying to control—gave rise to liability. The district court, applying the "qualitative" assessment permitted under Indiana law, was entitled to conclude that in the circumstances of this case an inference of falsehood from the "understandings" of witnesses unable to recount the speakers' words would not be reasonable. The court properly took the case away from the jury on the issue of truth. We therefore need not explore whether, if some of the speakers had conveyed falsehoods, GM would have had a qualified privilege to disseminate the news as widely as it did.[2]

GM's liability for the signs—which are not privileged and are capable of defamatory meaning—depends on its publication of the libel by failure to remove the message. *Restatement (Second) of Torts* § 577(2) (1977) states this principle:

> One who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication.

Indiana has neither embraced nor rejected this approach. Adoption of another's publication is an old basis of liability, however, and a speaker can adopt implicitly as well as explicitly. Failing to remove a libel from your building, after notice and opportunity to do so, is a form of adoption. We predict that Indiana will follow § 577(2) when the time comes, as have other states. E.g., *Tidmore v. Mills*, 33 Ala.App. 243, 32 So.2d 769 (1947); *Southern Bell Tel. & Tel. v. Coastal Transmission*, 167 Ga.App. 611, 307 S.E.2d 83 (1983); *Fogg v. Boston & Lowell R.R.*, 148 Mass. 513, 20 N.E. 109 (1889).

The principle can be overdrawn. The *Restatement* suggests that a tavern owner would be liable if defamatory graffiti remained in a bathroom stall a single hour after their discovery. Section 577 Illustration 15, derived from *Hellar v. Bianco*, 111 Cal.App.2d 424, 244 P.2d 757 (1952). The common law of washrooms is otherwise, given the steep discount that readers apply to such statements and the high cost of hourly repaintings of bathroom stalls. See *Scott v. Hull*, 22 Ohio App.2d 141, 259 N.E.2d 160 (1970). The burden of constant vigilance greatly exceeds the benefits to be had. A person is responsible for statements he makes or adopts, so the question is whether a reader may infer adoption from the presence of a statement. That inference may be unreasonable for a bathroom wall or the interior of a subway car in New York City but appropriate for the interior walls of a manufacturing plant,

---

2. Tacket complains about the exclusion of evidence that, he insists, would show that bald falsehoods were disseminated outside the plant. GM objected on the ground that the speakers were not acting in the course of their employment. Tacket neglected to make an offer of proof that would demonstrate how the speakers were acting within the scope of their employment (such as an offer to show that the remarks were made during business conversations), so we are in no position to evaluate the competing arguments. Tacket has not preserved this contention for appeal.

over which supervisory personnel exercise greater supervision and control. The costs of vigilance are small (most will be incurred anyway), and the benefits potentially large (because employees may attribute the statements to their employer more readily than patrons attribute graffiti to barkeeps).

■ The 3' by 30' sign was up for two or three days. No one testified about who put it up or took it down. Although managerial personnel had to be aware of the sign, its presence for three days at most is inconsistent with an inference that GM adopted its contents or desired its continued publication. A sign posted on one day, seen and ordered removed the next, and down on the third day plainly is the work of a prankster rather than General Motors Corporation. A large bureaucracy takes time to remove a sign: whoever first saw the banner may have had to pass the word through several layers of superiors and their subordinates until the directive reached the people in charge of the walls. The district court properly concluded that a reasonable jury could not infer that GM had "intentionally and unreasonably" (the words of the *Restatement*) kept this sign in view.

■ The small sign, visible for seven to eight months, is another matter. Tacket testified that shortly after his reinstatement he complained about the sign to John Swan, the maintenance superintendent of Plant 17, and asked Swan to have the sign removed. Swan denies that Tacket made such a request, but this is a dispute for the jury to resolve. John Huffman, who worked at Delco for 24 years and had never seen another sign stenciled on a wall, said that the sign was at eye level in one of the plant's main thoroughfares, an area visited daily by management. Another employee, who verified the uniqueness of the sign, opined that it could not have lasted for eight months without management's acquiescence and approval—which, he inferred, it had. Tacket testified that he saw Lyle Crouse, the general superintendent of Plant 17, standing next to the sign months before the sign was painted over, and one

may infer that Crouse saw the sign. A reasonable person could conclude that Delco "intentionally and unreasonably fail[ed] to remove" this sign and thereby published its contents.

■ The district court invoked the doctrine of avoidable consequences. See Prosser & Keeton, *Torts* § 65 (5th ed. 1984). Tacket, as night superintendent of Plant 17, could have ordered the sign obliterated; he did not and has only himself to blame for his injury. The difficulty with this approach is that Tacket was night superintendent of Plant 17 for only seven days after his suspension was lifted. We do not know how many of these passed before Tacket learned of the sign; he testified that between acquiring knowledge and leaving Plant 17 he asked Swan at least twice to deal with the sign. Swan, as maintenance superintendent of Plant 17, seems to have been the logical addressee of such a request. Perhaps Tacket should have given orders to his subordinates rather than to a fellow superintendent, but the jury could infer that by the time Tacket knew he would have no aid from Swan, he was no longer in a position to give orders. The jury might conclude, as Swan testified, that Tacket never protested about the sign; the jury might conclude that Tacket acted unreasonably in waiting for Swan to act; but the jury also could believe that Tacket acted prudently during the few days in question. The court should not have decided this issue on its own.

Tacket has an unenviable task, because even if he persuades the jury that General Motors published the small sign by inaction, that he took appropriate steps to deal with the sign, and that the sign defamed him, he still must trace injury to that sign. The consequences of the incident itself and the ensuing suspension, the rumors within the plant and community, the meetings to pass the word about his suspension, and the large sign are not GM's responsibility. It will be hard, perhaps impossible, to attribute damage to the small sign alone. But if Tacket wants to attempt this feat, he is entitled to try.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.