LUSON INTERNATIONAL DISTRIBU-
TORS, INCORPORATED,
Plaintiff–Appellant,

v.

Joe MITCHELL, and Elk–Bend Supply
& Machine Company, Incorporated,
Defendants–Appellees.

No. 89–2178.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1990.

Decided Aug. 9, 1991.

Robert Sutton (argued), Sutton & Kelly, Milwaukee, Wis., for plaintiff-appellant.

Aladean M. DeRose (argued), South Bend, Ind., for defendants-appellees.

Before COFFEY, RIPPLE and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Luson International Distributors, Inc. brought this diversity action against Elk–Bend Supply & Machine Co. and Joe Mitchell, Elk–Bend's president, in order to collect on a debt Elk–Bend owed for machinery it had purchased on consignment. Unfortunately for Luson, Elk–Bend filed for bankruptcy before Luson could collect the money it was due. With its action against Elk–Bend stayed by the bankruptcy filing, Luson continued to pursue its claim solely against Mitchell on the basis of his alleged oral promise guaranteeing the repayment of Elk–Bend's debt to Luson.[1] At the close of Luson's evidence, the court directed a verdict in favor of the defendant, finding that Luson had not adduced sufficient evidence to take Mitchell's oral promise outside the protection of the statute of frauds. The sole question presented by this appeal is whether the district court erred when it directed the verdict in favor of Mitchell. Because we agree with the district court that Luson failed to introduce sufficient evidence to support a verdict in its favor, we affirm.

## I.

The relationship between Luson and Elk–Bend began in 1980. Under the terms of their distributorship agreement, Luson was to ship its metalworking machinery—mills, grinders, and lathes—to Elk–Bend on consignment; in return, Elk–Bend agreed to remit payment for each machine received within thirty days of its sale. Elk–Bend, however, experienced business difficulties and became unable to make timely payments to Luson for the goods received. When Luson finally terminated its agreement with Elk–Bend in 1984, Elk–Bend owed it over twenty thousand dollars.

Approximately two years later, Elk–Bend decided that it wanted to renew its business relationship with Luson. Discussions between the companies were initiated when Mitchell contacted Robert Lu, the president of Luson, and requested a meeting to talk about their companies' past dealings and the possible resumption of the previous business relationship. Lu agreed to consider Elk–Bend's proposal and subsequently met with Mitchell at Luson's headquarters in Ravenswood, West Virginia on February 21, 1986. Mitchell, recognizing that Luson might be reluctant to enter into a second arrangement because of Elk–Bend's previous delinquency, brought a partial payment of Elk–Bend's debt to Luson—a check for ten thousand dollars—as a sign of good faith. At the meeting, Mitchell also promised to guarantee Elk–Bend's debt, stating: "Bob, I will do anything. I will personally

---

1. Luson has since obtained a default judgment against Elk–Bend which is not contested on appeal.

guarantee. I will sign any paper you wish me to sign, and I will even retain a CPA to supervise my floor when you consign a machine to me so that my machine will not be abused."[2] Finally, Mitchell agreed to remit the invoice cost of any Luson machine sold, as well as some extra money from each sale in order to pay off Elk–Bend's previously incurred debt.

Relying on Mitchell's promise to guarantee the past and future indebtedness of Elk–Bend, Lu agreed to resume the parties' past business relationship. As a result of the meeting, Mitchell received approximately $140 worth of Luson machinery parts Elk–Bend needed to service machines previously sold to its customers. In addition, over the next year and a half, Luson sent eleven machines to Elk–Bend on consignment. The companies' second business venture was no more successful than the first, however, and after approximately six months Elk–Bend was again delinquent in its payments to Luson.

To collect on Elk–Bend's debt, Luson brought suit against Elk–Bend and Mitchell for $35,649.51 in damages on October 8, 1987.[3] At trial in the district court, Luson argued that Mitchell was personally liable for Elk–Bend's debts because of his oral promise to Lu. As a defense, Mitchell maintained that he had never made any oral promise to Luson, and that, in any event, the oral agreement was unenforceable under the statute of frauds. When Luson had concluded its case, Mitchell made a motion for a directed verdict pursuant to Fed.R.Civ.P. 50(a). Reasoning that Luson had not presented evidence demon-

strating "any consideration flowing to Mr. Mitchell that would provide him with 'a personal, immediate, and pecuniary interest in the transaction,' ... so as to remove the suit from the statute of frauds," the district court granted Mitchell's motion.

## II.

■ On appeal, Luson maintains that the district court erred in granting Mitchell's motion for a directed verdict. In a diversity case, we apply the "same standard as a state court in passing on a motion for directed verdict." *Tacket v. General Motors Corp.*, 836 F.2d 1042, 1045 (7th Cir.1987); *see also Cincinnati Ins. Co. v. Taylorville*, 818 F.2d 1345, 1348 (7th Cir.1987); *Chaulk v. Volkswagen of America, Inc.*, 808 F.2d 639, 640 (7th Cir.1986). Under Indiana law,[4] an appellate court reviewing a trial court's grant of a motion for directed verdict must "inquire whether the evidence, taken with reasonable inferences in the light most favorable to the party opposing the motion, supports a judgment in favor of the non-moving party." *Tacket*, 836 F.2d at 1045; *Goldman v. Fadell*, 844 F.2d 1297, 1301 (7th Cir.1988); *Knight v. Baker*, 363 N.E.2d 1048, 1050 (Ind.App.1977). If no evidence supports the non-moving party, the motion for the directed verdict must be granted. *Bishop v. Firestone Tire & Rubber Co.*, 814 F.2d 437, 439 (7th Cir.1987); *American Optical Co. v. Weidenhamer*, 457 N.E.2d 181 (Ind.1983). Even if some evidence supports the non-movant, a grant of a directed verdict is still proper if the court determines the evidence is qualitatively inadequate. *Tacket*, 836 F.2d at

---

**2.** While Mitchell denies that he personally promised to repay Elk–Bend's debt to Luson, we accept Luson's version of the facts as true for the purposes of our analysis.

**3.** Only $3590.00 of this amount represented debt taken on by Elk–Bend since the renewal of its business relationship with Luson.

**4.** It was never conclusively determined whether the law of Indiana or the law of West Virginia should govern this dispute. Nor was this issue addressed by the parties on appeal. However, both Luson and Mitchell agreed that the substantive law of Indiana and West Virginia does not differ in any material respect concerning the enforceability of the oral agreement present-

ed by this case. The West Virginia test for granting a directed verdict also does not differ significantly from that of Indiana law. *See, e.g., Alexander v. Curtis*, 808 F.2d 337, 338–39 (4th Cir.1987) ("The question is not whether there is any evidence, but whether there is sufficient evidence upon which a jury could properly base a verdict in favor of the non-moving party.... A mere scintilla of evidence will not defeat the motion."). Where the law of the two states is essentially the same, we apply the law of the forum state. *International Admrs., Inc. v. Life Ins. Co.*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985). Thus, we examine Luson's claim under the law of Indiana.

1045; *Bishop*, 814 F.2d at 441. Evidence fails qualitatively "when it cannot be said, with reason, that the intended inference may logically be drawn therefrom; and this may occur either because of an absence of credibility of the witness or because the intended inference may not be drawn therefrom without undue speculation." *American Optical Co.*, 457 N.E.2d at 184; *see also Dettman v. Sumner*, 474 N.E.2d 100, 104 (Ind.App.1985) (qualitative failure of evidence if witness "presenting such evidence is not ... credible" or "inference the burdened party's allegations are true may not be drawn without undue speculation").

Designed to "guard against the dishonesty of parties and the perjury of witnesses," *Starkey v. Galloway*, 119 Ind.App. 287, 84 N.E.2d 731, 734 (1949), the Indiana statute of frauds provides that "no action shall be brought to charge any person upon a promise to answer for the debt of another unless that promise is in writing" and signed. *Tolliver v. Mathas*, 538 N.E.2d 971, 977 (Ind.App.1989); *see also Pettit v. Braden*, 55 Ind. 201 (1876); *National By-Products, Inc. v. Ladd*, 555 N.E.2d 518 (Ind.App.1990); IND.CODE ANN. § 32–2–1–1 (West 1979).[5] In this case, the parties agree that Mitchell's oral assurances were not reduced to a written agreement. Therefore, the Indiana statute of frauds bars enforcement of Mitchell's promise to guarantee the debt of Elk–Bend unless an exception exists to its application in this case.

Not surprisingly, Luson argues that two exceptions apply so that the statute of frauds does not prevent the enforcement of Mitchell's oral promise. Luson first maintains that the oral promise was an original promise outside the statute of frauds that benefitted Mitchell directly. In the alternative, it argues that the statute of frauds does not prevent the enforcement of an oral promise when necessary to prevent an unjust or unconscionable result. We address each contention in order.

■ Indiana case law has long held that the statute of frauds does not apply when the party receives a direct benefit as the result of his promise. In *Voris v. Star City Bldg. & Loan Ass'n*, 20 Ind.App. 630, 50 N.E. 779, 782 (1898), for example, the court stated:

> wherever there is in existence an obligation on the part of another, a promise to perform that obligation, if he does not, or to guaranty his performance, is not within the statute of frauds, if it is made upon a new consideration inuring to the benefit of the promisor, although the former obligation is not extinguished, provided the chief purpose of the promisor is to obtain a benefit to himself.

Or, in an alternative statement of the exception, the statute of frauds does not apply when the promisor received some consideration from his promise that provided him with a "personal, immediate and pecuniary interest in the transaction." *New Amsterdam Casualty Co. v. Madison County Trust Co.*, 81 Ind.App. 157, 142 N.E. 727, 729 (1924) (promisor's potential relief from $30,000 personal liability constituted sufficient direct, pecuniary interest to support enforcement of oral promise).

■ Luson maintains that it presented sufficient evidence of two immediate, personal and pecuniary benefits to Mitchell—the $140 of machinery parts and the resumption of Elk–Bend's business relationship with Luson—to defeat a motion for directed verdict. Luson's primary argument is that because Mitchell was the president, chief executive officer, and principal shareholder of Elk–Bend there should be a *per se* presumption that he was directly benefitted by Luson's resumption of business with Elk–Bend. Shareholder status by itself, however, is not enough to demonstrate that the defendant enjoyed a direct personal benefit as a result of the promise.

---

5. The Indiana statute of frauds provides:
   Section 1. No action shall be brought in any of the following cases:
   
   \* \* \* \* \* \*
   
   Second. To charge any person upon any special promise, to answer for the debt, default or miscarriage of another ... unless ... some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith.
   IND.CODE ANN. § 32–2–1–1 (West 1979).

*Cf. Mishawaka Brass Mfg., Inc. v. Milwaukee Valve Co.,* 444 N.E.2d 855, 858 (Ind. App.1983) (sole shareholder not liable for judgment against predecessor corporation where there was no intent to defraud creditors in transfer of assets because of his control over corporation); *American Indep. Management Sys., Inc. v. McDaniel,* 443 N.E.2d 98, 103 (Ind.App.1982) (A "corporate officer or shareholder may not be held liable for [fraudulent] acts by the corporation merely because he is an officer or shareholder.") (citing *Birt v. St. Mary Mercy Hosp. of Gary, Inc.,* 175 Ind.App. 32, 370 N.E.2d 379, 382 (1977)). We therefore refuse to adopt the *per se* presumption advocated by Luson.

■ Luson also argues that its course of dealings with Elk–Bend and Mitchell, as evidenced by various corporate documents, supports its claim that Mitchell received a direct benefit from the resumption of Elk–Bend's relationship with Luson. For example, Luson contends that the March 4, 1986 loan agreement, which was addressed to "Joe Mitchell" and began with the salutation "Dear Joe," demonstrates its business dealings were with Mitchell, not Elk–Bend. In addition, Luson notes that Mitchell signed the appropriate space on the form without referring to his representative capacity on the part of Elk–Bend and returned it to Luson. Thus, because the loan agreement was sent to, and signed by, Mitchell in his individual capacity, rather than in his capacity as president of Elk–Bend, Luson argues that it presented sufficient evidence to avoid a directed verdict.

Other corporate documents, however, minimize any significance of the March 4, 1986 loan agreement and further support the conclusion that Elk–Bend, not Mitchell, was the beneficiary of Mitchell's promise to guarantee Elk–Bend's debt. Here, Elk–Bend and Luson continued to conduct their business in much the same manner as before (with each machine sent pursuant to a written loan agreement, as well as a UCC financing statement). Despite the emphasis Luson places on the fact that the March 4, 1986 loan agreement was addressed to Mitchell, several unsigned loan agreements between Elk–Bend and Luson during the 1980–84 period were also addressed to "Joe Mitchell" and "Joe." Moreover, the UCC–1 financing statement signed by Mitchell after the February 26, 1986 meeting was identical to another issued in 1984. And, while the signature on the financing statements did not include his title of president, the printed word "By" preceded Mitchell's signature and "Elk–Bend Machinery & Supply Company, Inc." was typed above his name. Finally, as previously noted, Luson continued to prepare invoices for parts and machinery received for Elk–Bend—not Mitchell. Thus, we do not believe the Luson corporate documents reasonably support Luson's argument that Mitchell was the party directly benefitted by the resumption of the business relationship; rather, when viewed as a whole, they indicate that Luson continued to deal with Elk–Bend as a corporate entity after the resumption of the business relationship in 1984.

■ Nor can the machinery parts Mitchell acquired as a result of his trip to West Virginia be reasonably viewed as a direct personal benefit to Mitchell. As a quick review of the Luson corporate documents in the record reveals, Luson treated these parts as a credit sale to Elk–Bend. For example, a "Statement of Account" issued to Elk–Bend lists the $140.75 charge for a "part for Mill & Surface Grinder" as a charge to the Elk–Bend account. And although Luson's balance due statement for the $140.75 for "Parts for Mill & Surface Grinder" represents the charge as against the "Joe Mitchell" account, many of those charges pre-date the alleged oral promise and weaken Luson's argument that they were charged directly to Mitchell. Thus, Luson's evidence was insufficient to support any conclusion but that the only benefit Mitchell received from the machine parts came indirectly through Elk–Bend's ability to continue servicing and repairing Luson machines.

■ Finally, Luson argues that (under what it describes as a theory of equitable promissory estoppel) the statute of frauds will not prevent enforcement of an oral

promise where one party has performed its part of the bargain and a repudiation of the agreement would lead to unjust or fraudulent results. *Summerlot v. Summerlot,* 408 N.E.2d 820 (Ind.App.1980). *Summerlot* involved a disputed oral agreement to sell real estate and Indiana law provides that an "oral contract for the sale of land may be removed from the operation of the Statute of Frauds by the doctrine of part performance." *DuPont Feedmill Corp. v. Standard Supply Corp.,* 182 Ind.App. 459, 395 N.E.2d 808, 811 (1979); *see also Horner v. McConnell,* 158 Ind. 280, 63 N.E. 472 (1902); *Satterthwaite v. Estate of Satterthwaite,* 420 N.E.2d 287, 291 (Ind. App.1981); *McMahan Constr. Co. v. Wegehoft Bros., Inc.,* 170 Ind.App. 558, 354 N.E.2d 278, 282–83 (1976). Indeed, the Indiana courts have established several specific considerations when making this determination. *DuPont Feedmill Corp.,* 395 N.E.2d at 811 ("Circumstances generally held sufficient to invoke the doctrine of part performance as an exception to the Statute of Frauds are some combination of the following: payment of the purchase price or a part thereof, possession, and lasting and valuable improvements on the land.").

What is less clear is whether this exception applies outside of the context of an oral promise to sell real estate. Our research revealed one case—*Tolliver v. Mathas,* 538 N.E.2d 971, 976 (Ind.App.1989)—where the court held that a party's oral promise to guarantee a third party's debts was removed from the statute of frauds by the promisee's performance in reliance on the promise. For various reasons, however, we do not believe that in a case such as the one before us the Indiana Supreme Court would apply the part performance/equitable promissory estoppel exception. First, such a decision would eviscerate the protections provided by the statute of frauds, a legislative enactment. As one Indiana court has noted, "[w]hether the Statute of Frauds ... ha[s] become outmoded is a question more properly addressed to the General Assembly. It is not the function of this court to repeal acts of the legislature on grounds that they are unwise or outmoded." *Whiteco Indus.,*

*Inc. v. Kopani,* 514 N.E.2d 840, 844 (Ind. App.1987). Second, as best we can tell, there has been no trend toward embracing this exception; indeed, no Indiana court has commented (favorably or unfavorably) on *Tolliver.* And finally, as the great weight of Indiana case law holds, "[t]he mere nonperformance of an oral promise which falls within the scope of the Statute does not constitute such a fraud as would warrant the intervention of a court of equity." *Lawshe v. Glen Park Lumber Co.,* 176 Ind.App. 344, 375 N.E.2d 275, 278 (1978); *see also Kavanaugh v. England,* 232 Ind. 54, 110 N.E.2d 329, 331 (1953) ("mere breach or violation by one of the parties of an oral agreement which is within the statute of frauds, or his denial of the agreement or refusal to perform it, is not of itself a fraud"); *Whiteco Indus., Inc.,* 514 N.E.2d at 844 ("Were [the holding in *Kavanaugh*] not the rule the statute would be rendered virtually meaningless because the frustrated claimant would always assert an oral promise/agreement to defeat by means of estoppel the statute's requirement for a written one."). Rather, fraud exists only if one party is induced by another on the faith of an oral promise, to place himself in a worse position than he would have been in had no promise been made and "the party making the promise derives a benefit as a result of the promise." *Lawshe,* 375 N.E.2d at 278. Indeed, *Tolliver* is arguably distinguishable from the facts of this case because the court noted there that the guarantor of the promise received a benefit. *Tolliver,* 538 N.E.2d at 974. But, as our previous discussion concluded, Mitchell obtained no personal benefit as the result of his promise to guarantee the debt of Elk–Bend. Accordingly, his oral promise is not enforceable under the estoppel argument put forth by Luson as an exception to the statute of frauds.

### III.

For the foregoing reasons, the decision of the district court is AFFIRMED.