Filed 4/16/14  Lakireddy v. Soto-Vigil CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SIDHARDHA LAKIREDDY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO SOTO-VIGIL et al.,<br><br>    Defendants and Appellants. | A138675<br>A138822<br><br>(Alameda County<br>Super. Ct. No. RG12655745) |

In a contested municipal rent board election, respondent Sidhardha Lakireddy publicly supported candidates challenging a slate of candidates consisting mostly of incumbents (incumbent slate).  One incumbent slate candidate sent an e-mail to supporters attacking Lakireddy and referencing a criminal case involving relatives of Lakireddy.  Lakireddy sued three of the incumbent slate candidates for defamation, claiming the reference implied that he was personally involved in crimes of "human trafficking" and was "complicit in murder."  Two of the three defendants, appellants Alejandro Soto-Vigil and Asa Dodsworth, moved to strike the complaint pursuant to the anti-SLAPP law (Code Civ. Proc., § 425.16).[1]  The trial court denied the motion.  We reverse.  Lakireddy failed to establish a probability he would succeed on his claims against these two defendants because he cites no persuasive authority that they can be held liable for the e-mail, which was authored and linked to the campaign Web site solely by the third defendant.

_____

[1] SLAPP refers to strategic lawsuit against public participation.  (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57 & fn. 1.)

# I.    BACKGROUND

In 2012, commissioner candidates for election to the Berkeley Rent Stabilization Board (Berkeley Rent Board) ran as two opposing slates—the incumbent slate (formally known as the Progressive Affordable Housing Slate) and the Berkeley Tenants United for Fairness Slate (reform slate).  Soto-Vigil, Dodsworth, and Igor Tregub (collectively Defendants), were three of the four incumbent slate candidates.  Lakireddy, president of the Berkeley Property Owners Association (BPOA), supported the reform slate.

In the October 2012 edition of the BPOA newsletter, Lakireddy wrote:  "[T]here has been a big coup for the reform slate running for the Berkeley Rent Board . . . .  Three out of the four candidates on the reform slate were endorsed by the Berkeley Democratic Club. . . . [¶] At the same time, incumbent . . . Tregub also vied for the endorsement of the [Berkeley Democratic Club] and was rejected. . . . [This] is significant.  [Tregub] was California Democrat delegate to the Charlotte [Democratic national] convention. . . . [¶] This, my friends, is progress.  So I urge you, I plead with you, please go to [the reform slate's Web site] and donate what you can to each individual candidate. . . . [¶] This is the best chance we have to change things and they need your help!"

Later in October 2012, an e-mail was sent to incumbent slate supporters entitled, "It's Getting Nasty—Stand with Supervisor Keith Carson, Stand with Labor, Stand with Us!" (hereafter "It's Getting Nasty" e-mail).  The e-mail included the following language:  "Dear Supporters, [¶] You can't make this stuff up! . . . [T]he [BPOA] President—**the same guy whose family was caught in a human trafficking ring and was complicit in murder**—sent out a notice to mega-landlords attacking me for, among other things, being elected as your [Democratic national convention] Obama Delegate! [¶] Well, my friends, as the only all-Democratic slate running, we are proud to stand with our President and continue to push him in a more progressive direction. . . . [¶] . . . [W]e don't have the BPOA's megabucks, so we desperately need your help!  I hope you have by now seen to what lengths [our] opponents will go to stretch the truth to get themselves elected."  (Blue hyperlinked text replaced by boldface.)  The e-mail message appeared under the banner heading, "Elect the Progressive Affordable Housing Slate for Rent

2

Board," which included pictures and the names of all four incumbent slate candidates. The e-mail also bore the signature line: "With gratitude, [¶] Alejandro Soto-Vigil, Judy Shelton, Asa Dodsworth, and Igor Tregub" and "Soto-Vigil, Shelton, Dodsworth, and Tregub for Rent Board 2012."

The phrase in boldface contained an embedded Internet hyperlink to an article entitled, "How Lakireddy Case Spurred California Sex Trafficking Laws." Lakireddy does not dispute the accuracy of the article, which reported that in 2001 a Berkeley landlord, identified as Lakireddy Balireddy,[2] was convicted of two counts of transportation of minors for illegal sexual activity, part of a larger conspiracy since 1986 to bring at least 25 Indian laborers into the United States through false pretenses, subject them to sexual servitude, and require them to work in Bali Reddy's restaurants and rental properties. "The abuse might have gone undetected even longer but for a carbon monoxide leak in November 1999 in one of [Bali Reddy's] Berkeley apartments that killed Chanti Pratipatti, 17, whom he had trafficked months earlier," an incident the article identified as an "accidental death." The article stated that several members of Bali Reddy's family participated in the conspiracy, including his sons and his brother and sister-in-law. Not all of those family members were identified by name, and "Sidhardha Lakireddy" was not mentioned in the article. Lakireddy avers that he had virtually no contact with Bali Reddy or other relatives implicated in the scandal before they were arrested and that he had no prior knowledge of their criminal activities.

On October 23, 2012, Lakireddy's lawyer e-mailed and mailed a letter to all four incumbent slate candidates alleging that the "It's Getting Nasty" e-mail was defamatory of Lakireddy because it "strongly suggest[ed] that Mr. Lakireddy was involved 'in a human trafficking ring and was complicit in murder.' " He demanded the candidates publish a specifically-worded retraction. Tregub replied, denying that the e-mail was

---

[2] Respondent Lakireddy's father is one of Lakireddy Balireddy's brothers. Lakireddy spells his uncle's name "Bali Reddy," whereas the article used a "Balireddy" spelling. We assume Lakireddy's spelling is correct and use it for the remainder of the opinion.

defamatory of Lakireddy, apologizing "that this reference to his family has been brought up in this way," and offering to circulate a letter explaining the statement was not meant to imply Lakireddy was involved in the family scandal. Soto-Vigil and Dodsworth did not publish the retraction demanded by Lakireddy, but Soto-Vigil apologized to Lakireddy by e-mail in January 2013.

*Litigation*

Lakireddy sued Tregub, Soto-Vigil and Dodsworth for libel.[3] He alleged that "defendants" sent out the e-mail, that the e-mail was signed by all three Defendants, and that the e-mail was posted on their "joint" Web site. He alleged that Defendants' election campaigns paid for the production and distribution of the e-mail. He further alleged that Defendants refused to retract the e-mail and continued to post it on their Web site even after he had informed them of its libelous nature. Lakireddy later averred: "I suffer greatly from this smear. . . . [¶] . . . [¶] . . . Stirred up by people like [Defendants], people in Berkeley freely accuse me, and my own nephews and nieces, of these crimes even though we may not even have been born when the crimes occurred." He cited three situations in which he allegedly lost business opportunities because he had been "linked" to criminal behavior.

*Anti-SLAPP Motion*

Soto-Vigil filed an anti-SLAPP motion, which Dodsworth joined.[4] They argued they could not be held liable for libel because they did not publish the statement; Tregub was the sole author. The trial court granted Lakireddy leave to conduct additional discovery on this issue. The following relevant evidence was later presented to the court.

---

[3] Incumbent slate member Judy Shelton was not named as a defendant.

[4] Dodsworth apparently filed an additional brief on the anti-SLAPP motion in which he argued the "It's Getting Nasty" e-mail was not defamatory and that Lakireddy was a public figure, requiring application of the actual malice standard of *New York Times v. Sullivan* (1964) 376 U.S. 254. Dodsworth renews these arguments on appeal. Because we resolve the appeal by way of the republication issue, we need not address Dodsworth's additional arguments.

Tregub testified that he wrote and sent the e-mail unilaterally, without input from or the prior knowledge of Soto-Vigil or Dodsworth: he alone chose to format the e-mail so it appeared under a banner that included the incumbent slate candidates' names and over a signature line that included all four of those candidates' names. Using MailChimp e-mail technology, Tregub sent out several other e-mails in a similar format, also without first consulting with his fellow candidates. Soto-Vigil averred that he did not write the "It's Getting Nasty" e-mail, he never intended that the offending language be published, and he was not aware until after the e-mail had been circulated that it had been published. Soto-Vigil also received but never read several other e-mails Tregub sent out under the four candidates' names. Dodsworth testified that he did not write and he did not know much about the e-mails circulated by Tregub in the name of the entire slate. Tregub testified that neither Soto-Vigil nor Dodsworth ever objected to the content of the e-mails he sent out on behalf of the incumbent slate.

The four incumbent slate candidates were included in a single slate because they were all endorsed at an affordable housing convention. Once endorsed at the convention, they met to coordinate their election efforts. Soto-Vigil was in charge of distributing campaign literature, Dodsworth manned the office and hosted a fundraiser, and Tregub took responsibility for endorsements and communications, including the Web site and e-mails. The incumbent slate also had a Facebook page. The slate's physical mailings encouraged recipients to learn more about the candidates by visiting the Web site.

Each incumbent slate candidate had his or her own campaign account and Soto-Vigil and Dodsworth were the sole signatories on their respective checking accounts. Tregub, however, served as assistant treasurer for Soto-Vigil's campaign and Dodsworth and Tregub shared a common assistant treasurer. When the four candidates contributed toward a campaign expense, each wrote a separate check for his or her share of the expense. They shared the expense of physical mailings, the campaign office, and the design of the Web site. Once designed, the Web site was run by interns at no cost. The banner heading that Tregub incorporated into the MailChimp e-mail template was

originally designed for a physical mailing, for which the graphic designer was paid by all four candidates. The use of MailChimp was free.

To have something posted on the incumbent slate Web site, a candidate would propose content to an intern. Dodsworth never posted anything to the Web site, but he once asked that an outdated Twitter feed be removed from the Web site, apparently with success. Dodsworth was quite active in posting to the Facebook page. However, there is no evidence he personally posted the "It's Getting Nasty" e-mail on the Facebook page and Lakireddy does not allege that he did so. Soto-Vigil testified that he never looked at the Web site and he checked the Facebook page only twice. He did not know if anything had ever been removed from either.

The banner heading of the Web site stated, "Berkeley Rent Board [¶] Soto-Vigil, Shelton, Tregub & Dodsworth for Berkeley Rent Board." A column along the right side of the Web site included "Donate" and "Volunteer" buttons, links to Facebook, and a Twitter feed from "BRSB Tenants Slate." As of October 30, 2012, the Twitter feed part of the column included a text box stating "It's Getting Nasty—Stand with Keith Carson, Labor and Us!" which included a hyperlink to the "It's Getting Nasty" e-mail. As of February 21, 2013, "[t]he link to 'It's Getting Nasty' was still there, as was a link to [the] Twitter Feed and Facebook pages, through which 'It's Getting Nasty' could also be accessed."

Lakireddy argued that this evidence showed that Soto-Vigil and Dodsworth had republished the "It's Getting Nasty" e-mail on the incumbent slate's joint Web site and Facebook page even after Lakireddy had complained. They therefore played a responsible role in the defamatory publication. Citing *Hellar v. Bianco* (1952) 111 Cal.App.2d 424 (*Hellar*), Lakireddy argued "someone who permits a defamatory statement to remain on view is equally liable with the author." He also argued they were liable under principles of ratification, adoption and consent, and as joint venturers. In reply, Soto-Vigil argued that he (and Dodsworth) could not be held liable for failing to remove the e-mail (" 'inaction is not a republication' " (boldface omitted)), that there was

6

no evidence they played a responsible role in the publication even as ratifiers or adopters, and that the joint venture liability cases cited by Lakireddy were inapposite.

The trial court denied the anti-SLAPP motion: "[Lakireddy] submits evidence that, if credited, supports a finding that the offending email was published on behalf of all members of the slate through the link appearing on the slate's website, and that Dodsworth and the other slate members authorized or ratified the publication of the offending email by failing to remove the link from the slate's website when they had the authority to do so." Soto-Vigil and Dodsworth filed separate appeals, which have been consolidated for purposes of oral argument and decision.

## II.    DISCUSSION

We conclude Lakireddy failed to establish a probability of prevailing on his claims against Soto-Vigil and Dodsworth because he has not established any basis for their liability for the "It's Getting Nasty" e-mail.

A.    *Anti-SLAPP Law*

"[Code of Civil Procedure s]ection 425.16 provides for a special motion to strike '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' [Citation.] '[Code of Civil Procedure s]ection 425.16, subdivision (b)(1) requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim. . . .' [Citation.] . . . [¶] We independently review the trial court's order denying the anti-SLAPP motion de novo. [Citation.]" (*Cabrera v. Alam* (2011) 197 Cal.App.4th 1077, 1085–1086.)

Lakireddy does not dispute that his defamation claim arises from protected activity, namely Defendants' speech during a campaign for election to public office. (See, e.g., *Cabrera v. Alam, supra,* 197 Cal.App.4th at pp. 1087–1091 [homeowners association board candidate's statement about opposition supporter was made in a "public

7

forum" about a "matter of public interest" within meaning of anti-SLAPP statute].) Therefore, the only anti-SLAPP issue before us is whether Lakireddy showed a sufficient probability of prevailing on the merits of his claim.

The plaintiff bears the burden of establishing a probability of prevailing and " ' "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citations.]" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88–89.) "[A] motion to strike should be granted if, as a matter of law, 'the properly pleaded facts do not support a claim for relief. [Citation.]' [Citation.]" (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 809.)

Arising from election speech, this defamation case obviously implicates First Amendment concerns. (See *Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 548 ["[t]he right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech"]; *Cabrera v. Alam, supra,* 197 Cal.App.4th at pp. 1083–1085, 1089 [same regarding homeowners association board election].) The First Amendment places severe restraints on enforcement of state defamation law that inhibits free speech, particularly core political speech about the performance of public officials or the qualifications of candidates for public office. The United States Supreme Court explained the rationale for these restrictions in the seminal *New York Times v. Sullivan* case: "[T]he First Amendment . . . 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' [Citation.] . . . '[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions,' [citation], and this opportunity is to be afforded for 'vigorous advocacy' no less than 'abstract discussion.' [Citation.] . . . [¶] . . . [W]e consider [defamation actions] against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials . . . ." (*New York Times v. Sullivan, supra,* 376 U.S. at pp. 269–270; *id.* at pp. 271–272 [erroneous

8

statements are inevitable in free debate and "must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive' "].)

A plaintiff must meet a defendant's constitutional defenses "by showing the . . . defenses are not applicable to the case as a matter of law or by a prima facie showing of facts which, if accepted by the trier of fact, would negate such defenses." (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 824, overruled on another ground by *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5.) " '[I]n cases raising First Amendment issues . . . an appellate court has an obligation to "make an independent examination of the whole record" in order to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression." ' [Citations.]" (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 17.) Moreover, " 'because unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. [Citation.]' " (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 251.)

B.      *Probability of Prevailing on the Merits of the Libel Claim*

Under California law, "[l]ibel is defined by Civil Code section 45 as 'a false and unprivileged publication by writing, . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.' . . . [¶] In determining whether a statement is libelous we look to what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the communication. [Citation.]" (*Forsher v. Bugliosi* (1980) 26 Cal.3d 792, 802–803.) For purposes of our discussion here, we assume that the ironically and aptly titled "It's Getting Nasty" e-mail was defamatory.[5]

---

[5] At oral argument, we asked the parties to address the question of whether the e-mail was defamatory as to Lakireddy. (See *Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042 ["[i]n defamation actions the First Amendment also requires that the statement on which the claim is based must specifically refer to, or be 'of and concerning,' the plaintiff in some way"]; *Flynn v. Higham* (1983) 149 Cal.App.3d 677, 680 [" 'defamatory matter must be published concerning the plaintiff' "].) Since we find

9

"The general rule for defamation is that only one 'who takes a *responsible* part in the publication is liable for the defamation.' (*Osmond v. EWAP, Inc.* (1984) 153 Cal.App.3d 842, 852 . . . ; *Jones v. Calder* (1982) 138 Cal.App.3d 128, 134.) For example, the business manager of a foreign[-language] newspaper was not liable where there was no evidence that he had control over the editorial staff and it was undisputed that he had no knowledge of the preparation or content of the subject articles until after publication (*Sakuma v. Zellerbach Paper Co.* (1938) 25 Cal.App.2d 309, 321–322); and the distributor of allegedly libelous materials cannot be held liable unless it is shown that he either knew of its libelous content or knew of facts which imposed a duty to investigate. (*Osmond v. EWAP, Inc., supra,* at p. 855.)" (*Matson v. Dvorak, supra,* 40 Cal.App.4th at p. 549, parallel citations omitted.) Similarly, "[o]ne whose only contribution to a political campaign is financial, and who is not involved in the preparation, review or publication of campaign literature, cannot be subjected to liability in a defamation action for statements contained in that literature, just as one whose only involvement in the publication of a libelous magazine article is ownership of shares in the publishing company cannot be held personally liable for the defamatory article." (*Ibid.*)

Lakireddy does not dispute that Tregub alone wrote the e-mail and sent it out to a mailing list on October 18, 2012. The evidence also indicates that Tregub took primary responsibility for both the incumbent slate's Web site, and that Soto-Vigil's and Dodsworth's only involvement in the Web site was to occasionally view the site and, in Dodsworth's case, to ask on one occasion that outdated material be removed. There is no evidence that anyone other than Tregub was responsible for the links to the Facebook page and the Twitter feed on the slate's Web site. Lakireddy does not argue to the contrary.

Lakireddy seeks to hold Soto-Vigil and Dodsworth liable for the original e-mail and the posting of links on the Web site on two theories: first, that they were part of a

that Soto-Vigil and Dodsworth cannot be held responsible for the communication content, we need not resolve this issue.

joint venture with Tregub and thus jointly liable for his conduct; and second, that they are liable for failing to remove the links once the defamatory nature of the e-mail was brought to their attention. Because a defendant's responsibility for a defamatory publication is an element of a defamation cause of action, Lakireddy had the burden of establishing he had a probability of prevailing on this element of publication in order to defeat Soto-Vigil and Dodsworth's anti-SLAPP motion. (*Cabrera v. Alam, supra,* 197 Cal.App.4th at p. 1086.) He failed to do so.

     1.    *Joint Venture*

Lakireddy argues Soto-Vigil and Dodsworth "engaged in a *joint venture* with Tregub, dividing the campaign responsibilities among the several members of their slate. [They] delegated to Tregub the job of sending e-mails to potential supporters. As . . . joint venturer[s] with Tregub, [they are] liable for torts committed by Tregub during the course of that joint venture[,] . . . includ[ing] the libelous e-mail that Tregub sent out on behalf of the joint venture." (Boldface & fn. omitted.) It is not clear from the trial court's written order whether the court agreed that Soto-Vigil and Dodsworth were liable for the initial publication on the Web site and *also* for failing to remove the link, or only that they became liable when they failed to remove it. We conclude that Lakireddy's joint venture theory for initial publication liability is not viable.

The authority Lakireddy cites involves commercial joint ventures, with liability imposed on coventurers for wrongful conduct by one toward innocent contracting third parties. For example, coventurers in a real estate development project were held liable for another principal's false material misrepresentation to a lender that the property was free of encumbrances. (*Grant v. Weatherholt* (1954) 123 Cal.App.2d 34, 37–38, 45–48.) "Where one joint adventurer, acting with the scope of the joint venture, and in furtherance of its agreed purposes, is guilty of fraud in procuring benefits which are retained by the joint adventurers, all are liable for the fraud in compensatory damages. [¶] Liability is imposed under elementary principles of agency. [Citation.]" (*Id.* at pp. 45–46.) The same rule applies in the partnership context. (See, e.g., *Zemelman v. Boston Ins. Co.* (1970) 4 Cal.App.3d 15, 17–19 [copartners barred from collecting on partnership

11

insurance policies that were voided by one partner's fraudulent representations in applying for the policies]; *Miske v. Coxeter* (2012) 204 Cal.App.4th 1249, 1256–1257 [partners liable to innocent third party creditors for fraud and other torts committed by copartner].)  In another case cited by Lakireddy, *Shook v. Beals* (1950) 96 Cal.App.2d 963, a group of friends engaged in a leisure outing, rather than a commercial enterprise, were deemed to be joint venturers liable for the tortious conduct of one of their members. In this case, the friends jointly rented a plane for a fishing trip and one member of the group negligently piloted the plane and crashed it on landing.  All of the friends were held liable for the property damage in a jury trial.  (*Id.* at pp. 964–966.)  The court found that the plaintiff had established a community of interest in the airplane by virtue of the joint hiring of the plane.  "Each, legally, had the right of control over the plane and the driver, if he were their agent in operating the plane for them."  (*Id.* at p. 970.)  In reviewing the state of the law applicable to joint ventures, the court noted that " '[t]here can be no joint venture in the absence of an agency relationship.' " (*Ibid.*)

These cases are inapposite.  This is not a matter of joint liability to a commercial vendor.  Here, Lakireddy premises his claim on political speech, not commercial activity. While Lakireddy asserts that the candidates had jointly *funded* certain outreach efforts including the Web site, his claim is logically premised on a theory that Tregub was authorized to *speak* for all four candidates.  In the arena of speech liability, defamation and First Amendment law, rather than joint venture and partnership law, govern.

Under defamation law, a defendant is liable for a defamatory publication only if he or she played a responsible role in its publication.  Neither mere participation in an enterprise of which the publication was one part (*Sakuma v. Zellerbach Paper Co., supra,* 25 Cal.App.2d at pp. 321–322 [business manager of newspaper]), nor mere distribution of a publication (*Osmond v. EWAP, Inc., supra,* 153 Cal.App.3d at p. 855 [adult bookstore operator]), nor mere financial contribution to a publication (*Matson v. Dvorak, supra,* 40 Cal.App.4th at p. 549 [campaign donor]) is sufficient.  The evidence is undisputed that neither Soto-Vigil nor Dodsworth had any direct participation, or even prior knowledge of, the e-mail that forms the basis of Lakireddy's defamation claim.

12

Lakireddy has cited no authority, and we are aware of none, that political candidates who might share a common ideological or party affiliation, and who participate in jointly sponsored or funded advocacy activities, have thereby created an agency relationship authorizing other candidates to speak on their behalf.

2. *Liability for Failing to Remove Links from Web Site*

Lakireddy argues the evidence is sufficient to hold Soto-Vigil and Dodsworth liable for "republication of the defamation via the slate's website, because [they] allowed the links to the defamation [to] remain on [the] slate's website for several months, while [they] had the duty and ability to remove [them]." As noted, the trial court ruled, "[Lakireddy] submits evidence that, if credited, supports a finding . . . that Dodsworth and the other slate members authorized or ratified the publication of the offending e-mail by failing to remove the link from the slate's website when they had the authority to do so." The issue, in our view, is not whether Dodsworth or Soto-Vigil had the ability to remove the Web site posting, but whether they had the *duty* to do so. We disagree that liability for failing to remove the publication may be imposed on the facts of this case.

Lakireddy relies on *Hellar, supra,* 111 Cal.App.2d 424 and related cases. In *Hellar*, the proprietors of a tavern were potentially liable for defamation after their bartender failed to remove a defamatory statement about a plaintiff from the tavern's bathroom wall upon request. (*Id.* at pp. 425–426.) That potential liability, however, was premised on the duties of proprietors of public places: "Persons who invite the public to their premises owe a duty to others not to knowingly permit their walls to be occupied with defamatory matter. [Citation.] The theory is that by knowingly permitting such matter to remain after reasonable opportunity to remove the same the owner of the wall or his lessee is guilty of republication of the libel." (*Id.* at p. 426.) Other out-of-state cases cited by Lakireddy also involve defendants who controlled physical spaces open to the public and who were held liable for signs posted by employees under their control. (See *Tidmore v. Mills* (1947) 33 Ala.App. 243, 246, 253–254 (*Tidmore*) [grower potentially liable for defamatory sign placed on his property and not removed]; *Fogg v. Boston & L.R. Co.* (1889) 148 Mass. 513, 516–517 (*Fogg*) [railroad potentially liable for

defamatory statement posted by employee in ticket office and not removed]; *Woodling v. Knickerbocker* (1883) 31 Minn. 268, 270, 269–271 (*Woodling*) [store owners potentially liable for defamatory placard placed on store property by owners or employees and not removed]; see also *Tacket v. General Motors Corp.* (7th Cir. 1987) 836 F.2d 1042, 1047 [company potentially liable for failing to remove defamatory sign from interior wall of workplace, which was left in place six to eight months despite complaint by plaintiff].)

These cases are distinguishable. First, liability was based in part on "the positive acts of the defendants in continuing to invite the public into their premises where the defamatory matter was on view after the defendants had knowledge of the existence of same." (*Scott v. Hull* (1970) 22 Ohio App.2d 141, 143–144 [distinguishing *Hellar*, *Tidmore*, *Fogg*, and *Woodling* and holding property owner not liable for failing to remove (after notice) defamatory statement from outside wall of property].) Second, the defendants' control over the premises was superior to that of the initial publisher of the defamatory statements, either as the proprietor of the establishment where the initial publisher was a mere invitee (*Hellar*) or as the employer of the initial publisher (*Tidmore*, *Fogg*, and *Woodling*). Here, Soto-Vigil and Dodsworth at best had equal control over the Web site with Tregub. Lakireddy cites no case supporting imposition of liability for failure to remove defamatory statements in such a circumstance. (See *D.A.R.E. America v. Rolling Stone Magazine* (C.D.Cal. 2000) 101 F.Supp.2d 1270, 1273–1275, 1278–1280 [magazine has no agency liability for defamatory article it published where author was independent contractor rather than employee].)

The Ninth Circuit Court of Appeals rejected a claim similar to that which Lakireddy makes here—that failure to remove a Web site posting, once substantial indications of falsity existed, amounted to a republication. (*Roberts v. McAfee, Inc.* (9th Cir. 2011) 660 F.3d 1156, 1167 [applying California law in context of "single publication" rule for statute of limitations purposes].) The court was "not persuaded that Roberts' argument correctly foretells California law" and noted that "[h]e cites no case that actually espouses the theory, and other courts have rightly rejected similar theories." (*Id.* at pp. 1167–1168, citing inter alia *D.A.R.E. America v. Rolling Stone Magazine,*

14

*supra,* 101 F.Supp.2d at p. 1287 [no authority to support argument that publisher liable for defamation because it failed "to retract a statement upon which grave doubt [was] cast after publication"], and *Coughlin v. Westinghouse Broad. & Cable, Inc.* (E.D.Pa. 1988) 689 F.Supp. 483, 488 [noting that counsel were not able to cite "any case in any American jurisdiction which recognizes a claim sounding in damages for failure to retract what is defamatory"].)

Lakireddy has failed to meet his burden of proving a probability of success on his claims against Soto-Vigil and Dodsworth because the case law he cites does not support imposition of defamation liability on these defendants under these circumstances.

## III.    DISPOSITION

The order denying Soto-Vigil and Dodsworth's anti-SLAPP motion is reversed. The consolidated cases are remanded to the trial court with directions to enter a new order granting the anti-SLAPP motion and dismissing the action as to Soto-Vigil and Dodsworth.  Lakireddy shall bear Soto-Vigil's and Dodsworth's costs on appeal.

_____
Bruiniers, J.

We concur:

_____
Simons, Acting P. J.

_____
Needham, J.

15